UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GERRY BURKE and LESLIE CROUCH, individually and d/b/a M.J. CLEANING, | ) ) ) |
| Plaintiffs/Counter-defendants, | ) ) |
| v. | ) No. 3:02-cv-1187 ) |
| WES MORGAN CONSTRUCTION, INC., | ) Judge Thomas A. Wiseman, Jr. ) |
| Defendant/Counter-Plaintiff. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs/counter-defendants Gerry Burke and Leslie Crouch, individually and doing business as M.J. Cleaning ("Plaintiffs") are Tennessee residents who bring suit against defendant Wes Morgan Construction, Inc. ("WMC"), a foreign corporation, asserting claims for breach of contract and for violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-311 and -312 ("THRA"), for which they seek damages of $14,040 in connection with the contract claim and $200,000 in connection with the THRA claim. Pursuant to Rule 56, WMC has now filed a Motion for Summary Judgment (Doc. No. 10), with a supporting Memorandum of Law (Doc. No. 11) and Statement of Undisputed Material Facts (Doc. No. 12), seeking dismissal of all claims asserted against it in the Complaint. Plaintiffs have filed a response in opposition to WMC's motion and a response to WMC's statement of undisputed material facts (Doc. Nos. 15 and 17). Both parties have submitted exhibits in support of their respective positions.

Having considered the parties' arguments and the entire record on this matter, for the reasons set forth below, the Court will GRANT the defendant's motion for summary judgment and dismiss with prejudice the Plaintiffs' Complaint. Dismissal of the Plaintiffs' claims means that the Court is dismissing all claims over which it had original jurisdiction under 28 U.S.C. § 1332. The Court will exercise its discretion under 28 U.S.C. § 1367(c)(3) to remand WMC's counterclaim to state court.[1]

### II. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and

---

[1]The Court notes that Plaintiffs have apparently never filed an Answer to WMC's Counterclaim.

admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587; Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1068 (6th Cir. 1999). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of his case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388–89 (6th Cir. 1993). Of course, in responding to a motion for summary judgment, the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

WMC is a licensed contractor that served as the general contractor for the construction of the Fairway Meadows Apartments in Smyrna, Tennessee ("Fairway Meadows"). (Pls.' Resp. to Def.'s St. Undisp. Mat. Facts (Doc. No. 17) ¶ 1.) On December 5, 2000, WMC, as "Contractor," and M.J. Cleaning, Leslie Crouch, and "Jerry Burk" (Gerry Burke), collectively, as "Sub-Contractor," entered into a Sub-Contractor Agreement ("Subcontract") pursuant to which the Plaintiffs agreed to perform the construction clean-up at Fairway Meadows in exchange for payment by WMC. (10/31/2003 Affidavit of Gerry Burke ("Burke Aff.") (Doc. No. 16), Ex. 1 (Subcontract).)

WMC maintains that the Subcontract was solely with M.J. Cleaning, and that M.J. Cleaning was a sole proprietorship owned by Matthew J. Burke, who was, at the time of the events giving rise to this lawsuit,

2

the husband of plaintiff Gerry Burke. (See Doc. No. 12.) Gerry Burke has testified in an affidavit that prior to her divorce from Matthew Burke in May 2002, Gerry and Matthew Burke together formed a business known as M.J. Cleaning Services. It was operated very informally as a sole proprietorship. (Burke Aff. ¶ 4.) The couple's intent was for Gerry Burke to perform contract cleaning services of all types; Matthew Burke had no involvement in the business except that it was set up under a "Tax I.D. Number" in his name and the money Gerry Burke received from the business was deposited into a joint marital bank account. (Id.) When Matthew and Gerry Burke divorced, Matthew Burke made no claim for any interest in M.J. Cleaning, and Gerry Burke continued to operate the business as before, without obtaining a separate or new tax identification number or changing it over to her social security number. (Burke Aff. ¶ 5.)

Gerry Burke also testified that, although she had an informal arrangement with Leslie Crouch to split the money earned from the Subcontract equally, Ms. Crouch did not perform any of the work under the contract. Instead, she found a better job shortly before the effective date of the Subcontract, so Linda Helsel began working with Ms. Burke to perform the services required under the Subcontract. Again, Ms. Helsel and Ms. Burke had an informal partnership agreement to perform an equal amount of work and to split equally the money received from WMC under the Subcontract. (Burke Aff. ¶ 7.) Ms. Burke and Ms. Helsel were the only persons to perform any work at Fairway Meadows under the Subcontract. (Doc. No. 17, ¶ 15.) Ms. Helsel's name is not on the Subcontract.

Ms. Burke alleges that, after she and Ms. Helsel began work at Fairway Meadows, a WMC employee named Rich Farrow made unwelcome sexual advances toward her on two occasions. (Doc. No. 17, ¶ 17.) After the second occasion, Ms. Burke sent a letter to WMC dated November 7, 2001 providing notice of Rich Farrow's inappropriate behavior toward her. (Doc. No. 17, ¶¶ 20–21.) WMC fired Rich Farrow shortly after receiving the letter from Ms. Burke, apparently for reasons unrelated to her allegations. (See Burke Aff., Ex. 4.[2])

---

[2]A letter giving notice to Ms. Burke that Mr. Farrow had been fired,, signed by Greg Hutt, stated:
Being in receipt of your November 7, 2001 letter I am responding by stating the actions, as you presented them, are inexcusable and will not be tolerated by Wes Morgan Construction, Inc. nor myself. As you know Mr. Rich Farrow's employment has been terminated. The reasons for his termination are un-related [sic] to this matter. Therefore there is little I know to do except express my appreciation for your candor and concern for your well being.
(Burke Aff. Ex. 4.)

3

About three weeks later, on December 14, WMC sent a letter to "Leslie/Jerry" stating that it had come to WMC's attention that M.J. Cleaning did not have workers' compensation insurance coverage, and giving notice that failure to have coverage constituted a breach of the Subcontract. The letter also gave Plaintiffs until December 20, 2002 to provide proof that they had procured workers' compensation insurance, and stated that failure to do so would provide grounds for termination of the agreement. (See Burke Aff., Ex. 5.) Ms. Burke claims that when she received this letter, she called Greg Hutt, WMC's Vice President and the author of the letter, and emphasized to him that "nothing had changed" over the course of the nearly two years the parties had been working together, that she did not have any "employees," and that she and Linda Helsel were simply splitting the money they earned in an informal partnership arrangement. Ms. Burke felt that she did not need the insurance and it was very expensive. However, she "initially relented, and obtained worker's compensation coverage, but, upon completing further investigation regarding [her] obligations, [she] canceled the worker's compensation coverage." (Burke Aff. ¶ 11; see also Burke Dep. Exs. 10 and 12.)

Ms. Burke did not discuss her decision to cancel the workers' compensation insurance in advance with WMC. Instead, she wrote a letter to WMC dated January 2, 2002 stating that Tennessee law did not require worker's compensation insurance for employers with fewer than five (5) employees. (Burke Dep., Ex. 13.) In response, WMC notified Burke on January 7, 2002 that the Subcontract was terminated for M.J. Cleaning's failure to comply with the insurance requirements of the Subcontract. (Burke Dep., Ex. 1.) This lawsuit followed.

**B. Procedural Background**

WMC filed a Counterclaim in conjunction with its answer on January 30, 2003. It later filed an amended answer but did not amend its Counterclaim. The Counterclaim states causes of action against Plaintiffs for negligent or intentional misrepresentation, breach of contract, punitive damages, and workers' compensation fraud. (Doc. No. 4.) The counterclaim does not contain a specific *ad damnum* clause, but it is clear that the parties' contractual claim is worth a maximum of approximately $14,000 (see Compl. ¶ 5); in reality it is likely worth much less, given that WMC had an obligation to mitigate its damages. WMC purports to seek damages for misrepresentation and workers' compensation fraud, but it does not indicate how it was actually harmed by Plaintiffs' alleged misrepresentations apart from the contractual damages. Plaintiffs have never answered the Counterclaim. WMC's motion does not address any of the claims in its

4

Counterclaim.

WMC has, however, filed a motion asserting several alternative grounds for summary judgment of Plaintiffs' claims: (1) that the Plaintiffs are not proper parties and do not have standing to bring their claims; (2) that Plaintiffs' claim for breach of contract should be dismissed because WMC was justified in terminating the Subcontract as a result of the Plaintiffs' material breach; (3) that the retaliatory discharge claim should be dismissed because WMC is not an "employer" within the meaning of the Tennessee Human Rights Act; and (4) that Plaintiffs' retaliatory discharge claim must be dismissed because Plaintiffs cannot establish a *prima facie* case under Tenn. Code Ann. § 4-21-301(1). (Doc. No. 10, at 1.) Each of these contentions is addressed below.

## IV. DISCUSSION

### A. Defendant's Arguments In Support of Summary Judgment

#### *1. Whether Plaintiffs Are Proper Parties*

WMC argues that Ms. Burke and Ms. Crouch are not parties to the Subcontract and therefore lack standing to sue for breach thereof. Similarly, WMC argues that their claims should be dismissed under Fed. R. Civ. P. 17(a) since they are not the real parties in interest. In support of its argument, WMC points out that Ms. Burke stated in her deposition that M.J. Cleaning was always solely in her husband's name, that it was a sole proprietorship owned solely by her ex-husband, Matthew Burke, and that the tax identification number for M.J. Cleaning belongs to Matthew J. Burke. (See Doc. No. 11, at 6–7; see also Doc. No. 12, referencing 4/9/2003 Deposition of Gerry Burke ("Burke Dep.") at 20:3–12; 21:18–21 ("Q: Okay. But after going through this, you're pretty certain that the business was owned by Matthew Burke? A: Yes."); 22:1–7 ("Q: Was M.J. Cleaning always owned by Matthew Burke? A: Yes. Q: And was he always the only owner of M.J. Cleaning? A: Yes.")

WMC ignores the fact that the Subcontract actually identifies the "Sub-Contractor" as M.J. Cleaning *and* Leslie Crouch *and* Gerry Burke. (Burke Dep. Ex. 5.) It was signed by Gerry Burke as "Subcontractor," and the signature line does not suggest that she signed it in a solely representative capacity. (See Burke Dep., Ex. 5, at 1 and 5.) Thus, it is incontrovertible that Gerry Burke is a party to the Subcontract regardless of her relationship with M.J. Cleaning, and clearly has standing to bring suit in her own name. Moreover, Ms. Burke has attempted to clarify her deposition testimony by explaining that M.J. Cleaning actually operated

5

as an informal proprietorship originally owned by her husband and her together, though it was listed in her husband's name. However, her husband never had any actual involvement in the business and asserted no claim to it after they divorced. (Burke Aff. ¶¶ 4–5.) Thus, there is, at the very least, a genuine issue of material fact as to whether she has standing to bring suit on behalf of M.J. Cleaning as well.

With respect to Leslie Crouch, however, Gerry Burke's testimony in both her deposition and her affidavit make it clear that Ms. Crouch never performed any work under the Subcontract, was never entitled to receive any payments under the Subcontract, and therefore cannot assert a claim for damages for breach thereof. WMC's motion for summary judgment will therefore be granted on that basis as to any claims brought by Leslie Crouch individually.

### 2. Whether WMC Was Justified In Terminating the Subcontract

Article 5 of the Subcontract states in pertinent part as follows:

> The Sub-contractor agrees to obtain, pay and keep in place for the duration of this agreement the following insurance coverage: Workmen's Compensation, public liability, property damage and any other insurance coverage which may be necessary as required by the Owner, Contractor, or state, local or federal authorities. . . . Lack of providing proof of insurance is grounds for damages and/or costs and and/or [sic] termination of this Agreement.

(Burke Dep., Ex. 5, at 2.) There is no dispute that Plaintiffs did not maintain workers' compensation insurance. The question is whether their failure to do so constitutes a material breach of the contract justifying WMC's termination of it. The contract was executed and performed in Tennessee, so Tennessee law applies to its construction. The interpretation of a written agreement is a matter of law and not of fact. Park Place Ctr. Enters., Inc. v. Park Place Mall Assocs., L.P., 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992).

Plaintiffs make basically three arguments in support of their claim that their failure to obtain workers' compensation insurance was not material and that WMC therefore breached the contract when it terminated it. First, Plaintiffs argue that the phrase, "any other insurance coverage which may be necessary," modifies the reference in the Subcontract to workers' compensation insurance and, since workers' compensation insurance was not actually necessary, no breach occurred by virtue of the Plaintiffs' failure to secure such coverage. This argument is unavailing. Even if we accept as true, for the moment, Plaintiffs' argument that workers' compensation insurance was not required by law *and* that the referenced phrase should be read to modify the term "workers' compensation insurance," that phrase does not refer merely to requirements of

6

federal or state law. Instead, as quoted above, it states "and any other insurance coverage which may be necessary *as required by the Owner, Contractor*, or state, local or federal authorities." (Burke Dep., Ex. 5, at 2 (emphasis added).) In short, Plaintiffs agreed per the Subcontract to "obtain, pay and keep in place . . . Workmen's Compensation . . *and* any other insurance coverage which may be necessary *as required by [WMC]*." (Id.) There is no dispute that Plaintiffs failed to comply with WMC's directive in that regard.

Courts may not make a new contract for parties who have spoken for themselves, see Petty v. Sloan, 277 S.W.2d 355, 359 (Tenn. 1955), and may not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. See Atkins v. Kirkpatrick, 823 S.W.2d 547, 553 (Tenn. Ct. App.1991). Absent fraud, mistake or waiver, courts are required to interpret contracts as written, even though they contain arguably harsh or unjust terms. Whaley v. Underwood, 922 S.W.2d 110, 112 (Tenn. Ct. App. 1995). Thus, Plaintiffs' belief that they did not need workers' compensation insurance or that it was too expensive does not operate to relieve them of their obligations under the contract absent some other extenuating circumstances.

In fact, for their second argument, Plaintiffs appear to be raising some type of waiver argument. They claim that WMC was aware all along that Plaintiffs were operating as an informal partnership and that they had never had workers' compensation insurance. The principle of waiver as recognized in Tennessee is defined as the "voluntary relinquishment or abandonment of a known right or privilege." Felts v. Tenn. Consol. Retirement Sys., 650 S.W.2d 371, 375 (Tenn. 1983); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977). Ms. Burke testified that, upon receipt of the letter from Mr. Hutt giving notice that Plaintiffs would be required to obtain workers' compensation coverage, she immediately contacted Mr. Hutt "and emphasized to him that absolutely nothing had changed in [her] arrangement over the two year period that [she] had worked for [WMC]." (Burke Aff. ¶ 11.) There is, however, nothing in the record that suggests that WMC actually knew all along that Plaintiffs had not obtained workers' compensation coverage or that WMC knowingly relinquished its right to enforce that provision in the contract. Accordingly, to the extent Plaintiffs are trying to assert that WMC waived the right to terminate the Subcontract on that basis, Plaintiffs have failed to carry that burden.

For their final argument, Plaintiffs' position appears to be that their failure to obtain workers' compensation insurance could not constitute a material breach because, as a partnership, they were not

7

required by law to obtain workers' compensation coverage for themselves, and WMC had no exposure and knew it had no exposure to liability as a result of Plaintiffs' status. Plaintiffs contend that WMC was simply using the workers' compensation issue as an excuse to terminate the Subcontract, when the contract was really terminated in retaliation for Ms. Burke's having complained about the sexually harassing behavior of WMC's project superintendent. (See Doc. No. 15, at 6–7.) In other words, Plaintiffs appear to be claiming that it was completely unreasonable for WMC to enforce the contract as written, and this unreasonableness gives rise to an inference that the reason for termination proffered by WMC is pretextual.

However, mere unreasonableness is not a sufficient basis for avoiding a contract term unless it is actually unconscionable. Plaintiffs do not assert facts sufficient to support a finding of unconscionability,[3] and, in fact, cannot even establish that the provision, or WMC's enforcement of it, is unreasonable. Under Tennessee's workers' compensation law, if the employee of a subcontractor is injured and the subcontractor is not carrying workers' compensation insurance, the employee will be able to recover benefits from the general contractor instead. See Tenn. Code Ann. § 50-6-113(a). The purpose of this provision is to protect employees from irresponsible subcontractors and also to give general contractors incentive to require their subcontractors to carry insurance—as WMC did in this case. See Posey v. Union Carbide Co., 705 F.2d 833, 835 (6th Cir. 1983). Further, although employers with fewer than five employees are ordinarily exempt from the Workers' Compensation Law, Tenn. Code Ann. § 50-6-106(5), that exemption does not apply in the context of the construction industry. See id.; Tenn. Code Ann. § 50-6-113(f) ("[A]ny person engaged in the construction industry, including . . . subcontractors, shall be required to carry workers' compensation insurance. This requirement shall apply whether or not the person employs fewer than five (5) employees."). On the other hand, "[s]ole proprietors and partners" are exempt. Id.

WMC was clearly a contractor in the construction industry, and it apparently considered Plaintiffs, who were assisting on a construction site, to be just another subcontractor. While Plaintiffs allege now that

---

[3]Enforcement of a contract is generally refused on grounds of unconscionability where the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." Haun v. King, 690 S.W.2d 869, 872 (Tenn. Ct. App.1984), quoted in Taylor v. Butler, 142 S.W.3d 277, 285 (Tenn. 2004) (other citations omitted). An unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice. Taylor, 142 S.W.3d at 285. There is no contention in this case that the Subcontract is unconscionable.

8

they are partners or sole proprietors who are not required to carry coverage, and thus that WMC was never exposed to potential liability resulting from any injury they might have sustained on the job, it is clear that WMC was reasonable to presume that it might be so exposed. In fact, Ms. Burke's letter to WMC gave notice that Plaintiffs were declining workers' compensation coverage because Tennessee "does not require this type of insurance unless there are 5 or more employees in the company." (Burke Dep. Ex. 13.) That statement alone was sufficient to support a reasonable inference on the part of WMC that Gerry Burke and Linda Helsel were employees of M.J. Cleaning and thus that they were required, in the construction context, to maintain workers' compensation insurance. Ms. Burke's later statements, made in the context of this litigation, that she worked with Leslie Crouch and then Linda Helsel as informal partners and that M.J. Cleaning had no employees, simply have no bearing on whether WMC had a legitimate basis for believing that both women were or might be employed by M.J. Cleaning at the time it terminated the contract. Obviously, if there was a possibility that WMC might be exposed to liability if Plaintiffs did not have workers' compensation insurance, then WMC was reasonable in enforcing the requirement.

In sum, Plaintiffs' failure to carry workers' compensation insurance constituted a material breach of the Subcontract, and WMC had a legitimate basis for terminating the agreement as a result.

### 3. Application of the Tennessee Human Rights Act

WMC next argues that it is entitled to summary judgment on Ms. Burke's Tennessee Human Rights Act retaliation claim because (1) WMC was not Ms. Burke's "employer" under the statute, both because it employed fewer than eight persons within Tennessee, see Tenn. Code Ann. § 4-21-102(4), and because WMC and Ms. Burke were in a contractor/subcontractor relationship rather than an employee/employer relationship; and (2) Ms. Burke cannot establish a prima facie case under the THRA.

Without reaching the questions of whether WMC qualified as Ms. Burke's employer, the Court agrees that Ms. Burke has failed to establish a prima facie case and, even if she could establish a prima facie case, she cannot demonstrate that WMC's proffered reason for terminating the Subcontract—Plaintiffs' failure to maintain workers' compensation insurance—was pretextual, for the reasons set forth above.

The THRA, in part, prohibits employers from retaliating against an employee who "has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing." Tenn.Code Ann. § 4-21-301(1)(1991). THRA runs, essentially, a parallel course with Title VII,

9

42 U.S.C.A. § 2000e-3(a), and Tennessee courts have followed federal law construing Title VII in their application of the THRA. See, e.g., Miller v. City of Murfreesboro, 122 S.W.3d 766, 775 (Tenn. Ct. App. 2003); Austin v. Shelby County Gov't, 3 S.W.3d 474, 480 (Tenn. Ct. App. 1999). Newsom v. Textron Aerostructures, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995). Whether a retaliatory discharge claim is brought pursuant to the provisions of THRA or Title VII, a plaintiff must prove the same four elements: (1) that the plaintiff engaged in an activity protected by the statute; (2) that the defendant had knowledge of the plaintiff's exercise of protected activity; (3) that the defendant thereafter took an employment action adverse to the plaintiff; and (4) that a causal connection existed between the protected activity and the adverse employment action. Miller, 122 S.W.3d at 775.

Even assuming Ms. Burke can satisfy the first three elements (assuming that her report of sexual harrassment was a protected activity of which WMC obviously had knowledge and she suffered an adverse employment action when WMC subsequently terminated the Subcontract), Ms. Burke has not established a causal connection between the two events. To be precise, other than the temporal relationship between the two events, there is simply no objective evidence in the record to substantiate Ms. Burke's conclusory declaration that she "was fired because of her complaints about Rich Farrow" and that "Greg Hutt was angry about having to terminate Farrow in the middle of the project." (See Burke Decl. ¶ 12.) Conclusory allegations in an affidavit do not create specific fact disputes sufficient to defeat summary judgment. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888–89 (1990); Hartsel v. Keys, 87 F.3d 795, 805 (6th Cir. 1996) (disregarding declaration containing only conclusory statements). Further, the Sixth Circuit has repeatedly held, in the context of Title VII, that temporal proximity alone is insufficient to establish an inference of causation. See Nguyen v. City of Cleveland, 229 F.3d 559, 566–67 (6th Cir. 2000); Cooper v. City of N. Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986). Accordingly, Ms. Burke cannot establish a prima facie case of retaliation under the THRA.

Again, even if she could make out a prima facie case, she cannot establish that WMC's proffered reason for terminating the Subcontract was pretextual. The proffered reason, as set forth above, is that Plaintiffs breached the contract by failing to maintain workers' compensation insurance coverage. To establish pretext, Ms. Burke must either provide direct evidence that a discriminatory reason more likely motivated the employer, or show indirectly that the employer's explanation is not credible. Tex. Dep't of

10

Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); Kline v. Tenn. Valley Authority, 128 F.3d 337, 342–43 (6th Cir. 1997).  There is no direct evidence of discrimination in the record, and, for the reasons discussed above, Ms. Burke cannot show that the employer's explanation is not credible.  The THRA claim must therefore be dismissed.

### B. Disposition of Defendant's Counterclaims

This case was removed from state court on the basis of diversity jurisdiction, as there was complete diversity of citizenship and the amount in controversy as stated in the Complaint was greater than $75,000.  The Complaint met the jurisdictional limit because Plaintiffs claimed compensatory and punitive damages in connection with their THRA claim in the amount of $200,000 (Compl. ¶ 6), despite the fact that they claimed contract damages of only $14,040 (Compl. ¶ 5.)  Accordingly, this Court had original subject-matter jurisdiction over the Complaint pursuant to 28 U.S.C. § 1332.

WMC filed its counterclaims on January 30, 2003, stating claims against Plaintiffs for negligent or intentional misrepresentation relating to Plaintiffs' failure to obtain workers' compensation coverage, breach of contract, punitive damages, and statutory workers' compensation fraud.  (Doc. No. 4.)  The counterclaim does not contain a specific *ad damnum* clause, but, as indicated above, the contract claim is worth no more than $14,000 (see Compl. ¶ 5), and likely much less because WMC would have been obligated to mitigate its damages.  WMC does not allege any facts showing that it was actually damaged as a result of Plaintiffs' alleged misrepresentations regarding their workers' compensation insurance coverage, though it does reference the workers' compensation statute, which provides for a maximum penalty of $10,000 for "workers' compensation fraud."  Under the circumstances presented here, the Court finds to a legal certainty that the amount in controversy in the Defendant's counterclaim is less than the jurisdictional minimum of $75,000, and no federal question is presented.  The Court therefore lacks original jurisdiction over the counterclaim.  See 28 U.S.C. §§ 1331 and 1332; Mass. Ca. Ins. Co. v. Harmon, 88 F.3d 415, 416 (6th Cir. 1996) (stating the standard for plaintiff to show the amount in controversy).

By dismissing the Complaint, the Court has dismissed all claims over which it had original jurisdiction.  See Sachs v. City of Detroit, 257 F. Supp. 2d 903, 916 (E.D. Mich. 2003) (considering whether to exercise supplemental jurisdiction over state law counterclaim after granting defendant's motion for summary judgment).  Before proceeding with this litigation, the Court must decide whether to continue to exercise

supplemental jurisdiction over the counterclaim. 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction").

A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims. Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254 (6th Cir.1996). In making that decision, the Court should consider factors such as "judicial economy, convenience, fairness, and comity." See id. (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). In Sachs, the court declined to exercise supplemental jurisdiction over a state law counterclaim reasoning that "[a]lthough this Court is familiar with the procedural history of this case, and has knowledge of its underlying facts, the state courts involved can just as easily . . . become familiar and knowledgeable. Indeed, a state court presumably has greater expertise with state law than a federal court." Id. (citations omitted). The procedural posture of Sachs differs somewhat from that of this case. In particular, the Court notes that this case has been pending since December 2002, and the motion for summary judgment had been briefed and ripe for nearly two years before being referred to this particular district court judge. Nonetheless, Plaintiffs have never answered the Counterclaim; no trial date has ever been set in this matter; it appears that WMC's damages, if any, are minimal at best; and the Court finds that the parties will not suffer undue delay if the matter is referred to state court. The Court will therefore exercise its discretion to remand this case back to the Chancery Court for Rutherford County, Tennessee.

**V. CONCLUSION**

For the reasons set forth above, WMC is entitled to summary judgment on Plaintiffs' claims for breach of contract and retaliation under the THRA. Plaintiffs' claims will therefore be DISMISSED. WMC's counterclaims will be remanded to state court.

An appropriate order will enter.

_____
Thomas A. Wiseman, Jr.
Senior United States District Judge